IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DALLAS RATLIFF,

                    Plaintiff,

        vs.                                        Case No. 20-2483-SAC-GEB

AT&T SERVICES, INC.,

                    Defendant.

MEMORANDUM AND ORDER

        The plaintiff Dallas Ratliff ("Ratliff") sues AT&T Services, Inc. ("AT&T")
alleging unlawful interference with and termination of her employment in violation of
the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*; the Family
and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*; 42 U.S.C. § 1981 ("§
1981"); and Title VII of the Civil Rights Act ("Title VII") 42 U.S.C. § 2000e, *et seq.* As
set out by stipulation, Ratliff worked as a service representative in Topeka for
Southwestern Bell Telephone Company, an affiliated entity of AT&T, from 1998 to
2016 when she moved to being a service representative for AT&T holding that position
until the forced disposition in December 2020. In the summer of 2021, Ratliff was
offered accepted a position of Premier Service Consultant Sales with AT&T Mobility
Services LLC. AT&T moves for summary judgment (ECF# 51) arguing numerous legal
and factual deficiencies with Ratliff's theories and proof. AT&T also has filed a
motion to exclude evidence from the plaintiff's social worker. ECF# 53.

**SUMMARY JUDGMENT STANDARDS**

        Summary judgment is appropriate "if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a

1

matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding the motion, the court's role is "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The court may grant summary judgment for lack of a genuine issue when the evidence is insufficient "for a jury to return a verdict," when "the evidence is merely colorable," or when the evidence "is not significantly probative." *Id.* It follows then that a genuine issue for trial exists when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden is met "by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler*, 144 F.3d at 671. The burden then shifts to the nonmovant to "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational fact finder could find for the nonmovant." *Id.* (internal quotation marks and citations omitted). Such facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

The court applies this standard drawing all inferences arising from the record in the nonmovant's favor. *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003). The court does not make credibility determinations or weigh the evidence;

these are jury functions. *Id*. at 1216. The Tenth Circuit has counseled the following

for summary judgment proceedings in employment discrimination cases:

> [I]n the context of employment discrimination, "[i]t is not the purpose of a
> motion for summary judgment to force the judge to conduct a 'mini trial' to
> determine the defendant's true state of mind." *Randle v. City of Aurora*, 69
> F.3d 441, 453 (10th Cir. 1995). Many of the highly fact-sensitive determinations
> involved in these cases "are best left for trial and are within the province of
> the jury." *Id*.; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106
> S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he inquiry [at summary judgment is]
> whether the evidence presents a sufficient disagreement to require submission
> to a jury...."). Consequently, "in this Circuit . . . an employment
> discrimination suit will always go to the jury so long as the evidence is
> sufficient to allow the jury to disbelieve the employer's [explanation for the
> alleged misconduct]." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1177 (10th
> Cir. 1998) (Tacha, J., concurring in part); *see Randle*, 69 F.3d at 452 ("[I]f . . .
> inferential evidence is sufficient to allow a plaintiff to prevail at trial, it is
> surely sufficient to permit a plaintiff to avoid summary judgment so that the
> plaintiff can get to trial.").

*Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1220-21 (10th Cir. 2015).

## STATEMENT OF UNCONTROVERTED FACTS

The court regards the following facts to be uncontroverted after full

consideration of matters properly submitted by the parties. The court also reviewed

and considered the plaintiff's additional statement of facts and submitted record. The

following reflects only those facts relevant to the critical issues conclusive of these

summary judgment proceedings.

For the relevant period, Ratliff was employed by AT&T in Topeka as a

service representative working the inbound call center, and she had established a net

credited service date of December 26, 1998. As a member of the Communication

Workers of America ("Union"), Ratliff's employment was governed by a collective

bargaining agreement ("CBA"). AT&T used a system of corrective action for its service

representatives that was consistent with the CBA. The system followed progressive

steps from Performance Notice (active for six months), Written Reminder (active for

nine months), Decision Making Leave (active for 12 months), and termination. A

service representative disagreeing with a discipline step or with a performance

assessment could pursue a grievance through her union.

Ratliff asserts that on December 13, 2019, she overheard another Union

member, Teri Hastings, loudly talking about her. Ratliff approached Hastings asking

what the problem was. Hastings denied that she was talking about Ratliff and that she

intended to speak with supervisor Julie McCoy. When Ratliff later saw McCoy talking

with Hastings and both going into a conference room, Ratliff sent the following

instant message or "Q" to McCoy:

> Ratliff (10:39:05 AM): I can join you if you would like?
> McCoy (10:46:18 AM): No need but ty [thank you].
> Ratliff (10:46:35 AM): I would like to speak to you as well, so you get the whole
>      story!
> McCoy (11:07:56 AM): Ok . . . give me a min. I had to jump on this call . . . I
>      will Q you when I am available.
> Ratliff (11:12:29 AM): Sounds good!
> Ratliff (11:14:02 AM): Or you know what it is okay, I am sure I will be
>      addressed. As the one in the wrong. Telling my side won't matter. I
>      don't have white privilege.
> McCoy (11:14:24 AM): What??
> Ratliff (11:14:31 AM): Right

*See* ECF# 52-9.

In investigatory meetings over this incident, Julie McCoy who is a Black

woman told Ratliff that the "white privilege" comment had offended her, because "as

two Black women we can't speak that way." ECF# 52-4, p. 28. Ratliff responded, "I

don't identify as a Black woman, I'm biracial. I am not a racist. I was asking for help."

*Id.* On December 17, 2019, Ratliff was "placed on a Written Reminder for Misconduct"

which stated that it would "remain active for a period of nine months and . . .

4

removed on September 17, 2020," based on her "compliance." ECF# 52-8. The

Written Reminder also stated that, "On December 13, 2019, you sent a Q message to

a manager that contained a discriminatory statement which is an AT&T Code of

Business Conduct violation and will not be tolerated." *Id.*  Ratliff understood from the

meetings that she was being disciplined for her white privilege comment. During the

investigatory meetings, Ratliff recalls her effectiveness with others being discussed

but that she wasn't in trouble for that conduct. ECF# 52-4, p. 29. After the

investigatory meeting, Tresa Gonzalez, who supervised Hastings but not Ratliff, issued

Hastings a Performance Notice for lack of effectiveness with peers based on the

conflict with Ratliff.

On February 10, 2020, Ratliff began a grievance with her Union over her

Written Reminder discipline of December 17, 2019. Ratliff later accepted resolution

of the grievance on October 28, 2020, and her discipline was reduced from the nine-

month Written Reminder to a six-month Performance Notice. In the meantime,

Gonzalez became Ratliff's supervisor in July of 2020. Gonzalez avers that "Ratliff did

not lose any pay because of the Written Reminder, and she did not advance to any

further steps of discipline." ECF# 52-2, ¶ 5. And on September 24, 2020, a month

before Ratliff's grievance was resolved, Gonzalez emailed Ratliff that the nine months

to her Written Reminder had expired "and the step of discipline was inactive." *Id.* at

¶ 6.

In March 2020, pursuant to a memorandum of understanding between

AT&T and the Union, Ratliff and other service representatives began temporarily

working from home due to the COVID pandemic. Ratliff testified her co-worker

problems ceased with working at home. In April 2020, Ratliff requested a job accommodation through AT&T's Integrated Disability Service Center ("IDSC") to permit her to work from home "permanently." On May 22, 2020, IDSC sent Ratliff a letter stating her proposed accommodation of permanently working from home effective April 13, 2020, had been received and was still under review and for determination "whether it can be reasonably accommodated without creating an undue hardship." ECF# 52-12. The letter explained that her accommodation request would be communicated with her supervisor and that she should contact her direct supervisor as to the status of this decision. *Id.* Ratliff testified that her second-level supervisor Angie Winchester spoke with her about this requested accommodation and an alternative accommodation of high walls and a window seat and that Ratliff refused this alternative. Ratliff testified she also discussed this requested accommodation with another AT&T representative, Carol Stevenson. On June 15, 2020, IDSC sent Ratliff a letter stating that it would provide this reasonable alternative accommodation of working from home temporarily until the Center reports back into the office after the pandemic. The letter further states:

> If you wish to extend your accommodation beyond the end date, it is your responsibility to contact the IDSC no later than 10 calendar days before the end date to request an extension. The IDSC will provide a new Medical Evaluation form ("MEF") for your health care provider to complete.
> Requesting to extend your claim does not mean the department will be able to continue to provide this accommodation. Your department must still review the request and determine whether it can be reasonably accommodated without creating an undue hardship. Your department will engage in an interactive discussion with you at that time, which may include considering alternative approaches to enable you to perform the essential function of your job. Those essential functions include, but are not limited to, regular and reliable attendance.

ECF# 52-13. One week later, Ratliff emailed Stevenson and Winchester explaining she understood that she would work from home "for now and will continue to until I am told differently" and that "if HR is unable to allow me to continue to" work from home then she wanted to know the reasoning and hardship to the company. ECF# 52-14, p. 1. Winchester replied by email the same day summarizing Ratliff's position on alternative work accommodations and concluding with, "[r]ight now, we are continuing to work from home and will do so until the Company in partnership with our CWA deems we can return to work safely." *Id.* It is undisputed that Ratliff continued working from home throughout the remainder of her employment with AT&T.

Consistent with the governing workforce adjustment procedures under the CBA, on September 17, 2020, AT&T announced a "surplus" to reduce service representative positions at the Topeka call center due to a reduction in the workload. AT&T informed the Union that of Topeka's 51 service representative positions, 19 were at risk. Those 19 service representatives with the lowest net credited service were identified at risk, and Ratliff was listed as eighth from the bottom of those at risk in the surplus. The CBA required AT&T to attempt to reduce or eliminate the surplus by offering voluntary severance packages or opportunities for transferring to other open positions covered by the CBA.

Surplus employees could submit a Surplus Transfer Request ("STR"), that is, a "transfer request that affords a surplus employee the opportunity to receive consideration for any available nonmanagement position at any location within the Company and priority consideration for any lateral or downgrade placement." ECF#

52-1, ¶ 12. "Priority consideration meant surplus employees would be considered for vacancies in positions covered by the CBA before non-surplus employees and before surplus employees who had less seniority as defined by the CBA." *Id*.  As to STRs, AT&T "did not consider whether employees were on a step of discipline or were not meeting performance expectations." *Id*. at ¶ 13. For STRs, AT&T also "did not look at attendance or use of FMLA or other types of leave." *Id*. By the terms of the CBA, AT&T was to lay off in inverse order of seniority any remaining at-risk employees at the end of the surplus period. Twelve at-risk service representatives, including Ratliff, submitted STRs, but they did not receive "other positions and so were involuntarily separated at the end of the surplus period with a severance payment determined by the CBA." ECF# 52-1, ¶ 19.

While employees affected in a surplus period may apply for positions in other AT&T family companies, the CBA did not offer priority consideration for those positions outside the CBA. Ratliff did apply for a retail sales consultant position with AT&T Mobility Services LLC ("Mobility LLC"), which is a company separate from the defendant and which has a different CBA. Ratliff testified she declined Mobility LLC's offer because it paid less than her former position, offered different retirement benefits, and would have made her ineligible for severance pay under the CBA.

Based on agreements with the Union, AT&T is to offer, before involuntary layoff, the at-risk employee the security of a Job Offer Guarantee ("JOG") of a job for which the employee is qualified, provided the employee meets certain conditions. One of those conditions is that the at-risk employee "[m]eet[s] expectations on his/her current job." ECF# 52-1, ¶ 22. According to Paul Cardarella,

the AT&T's Director of Labor Relations, "meeting expectations meant currently meeting all expectations, including attendance, performance measurements, safety, and compliance with the Company's Code of Business Conduct. The determination was based on current status, and was not based on prior performance appraisals or any expired discipline." *Id*. at ¶ 23. Mr. Cardarella also avers that "FMLA leave is an approved absence and did not affect at-risk employees' eligibility for JOG." *Id*. at ¶ 24. Ratliff's December 2019 discipline, whether as a Written Reminder or as a later reduced Performance Notice, had expired and "did not impact her eligibility for JOG." *Id*. at ¶ 25.

Performance measurements are included in the condition of meeting expectations for JOG. As explained by Tresa Gonzalez, AT&T's Manager Network Operations in Topeka, the performance of service representatives is measured using objective metrics including quality audits on the accuracy of work and a "BERT Efficiency" score that measures the time it takes "a Service Representative to process tasks relative to a pre-determined average handle time." ECF# 52-2, ¶¶ 7-8. Gonzalez notes this efficiency is "measured only while employees were at work, so any time off work, including FMLA time, did not impact the BERT efficiency score. Service Representatives were expected to have a BERT efficiency score of at least 100%." *Id*. at ¶ 8. The BERT efficiency score is calculated from data in the system including that information which service representatives input on how they spend their work time. Managers at the center have no role in calculating the BERT efficiency score.

Ratliff's efficiency score was below 100% at the time of the surplus. On December 10, 2020, Ratliff emailed Gonzalez saying she wanted to qualify for JOG on

December 17th and was confused by what appeared on her "job" page. ECF# 52-17, p. 1. Gonzalez replied that Ratliff's BERT efficiencies for the calendar year were below 100% so she did not qualify for JOG. *Id.* Ratliff replied questioning whether all her work was coded in October, when her PC went down, and why no work was recorded for August. ECF# 52-17, p. 2. Gonzalez replied that the month of August was removed from everyone's efficiency score "due to a SOE/BERT issue" and that the window for adjusting her October work numbers had closed. *Id.* Ratliff followed up with a request for her August numbers. Gonzalez replied by email saying she had run Ratliff's efficiency numbers again with and without the August numbers, and Ratliff's efficiency score remained less than 100%. *Id.* at 3.

"None of the 19 at-risk employees were qualified for and elected a JOG." ECF# 52-1, ¶ 27. On December 16, 2020, AT&T terminated Ratliff's employment and paid her severance of $46,270 which was almost a full years' pay under the CBA. Ratliff did not pursue a Union grievance over the surplus or her termination.

In March of 2021, Ratliff applied for a Work From Home Service Representative position with Mobility LLC which is a separate company from AT&T. The plaintiff did not make the first hiring class that was offered positions in March. In filling this class, Maria Pereira "had no knowledge of Ms. Ratliff's race or that Ms. Ratliff had filed any internal or external complaints or lawsuit" and had no "conversations with any of her former managers about her at any time." ECF# 52-10, ¶ 3. The plaintiff was offered a position in the second hiring class in July of 2021. Ratliff began working for Mobility LLC on August 9, 2021.

**ADA FAILURE-TO-ACCOMMODATE CLAIM**

In the pretrial order, the plaintiff alleges she was discriminated "based on her disability" in that she "made a reasonable request for accommodation, to permanently work from home to relieve her harassing and discriminatory work environment, that request was denied." ECF# 50, p. 10. As part of her factual contentions, the plaintiff alleges that "a consequence of Plaintiff's unfair treatment [by the defendant], she experienced severe anxiety and depression, requiring medical treatment." *Id.* at p. 6. The plaintiff factually alleges she "requested to permanently work from home in order to alleviate the pressure of her hostile work environment." *Id.*

"An employer violates the ADA by failing to make reasonable accommodations to the known physical or mental disabilities of an otherwise qualified individual with a disability, unless such accommodation would pose an undue hardship on the employer." *Edmonds-Radford v. Southwest Airlines Co.*, 17 F.4th 975, 992 (10th Cir. 2021)(citing in part 42 U.S.C. § 12112(b)(5)(A)). Under the modified burden-shifting framework, the plaintiff first must make a prima-facie showing that she "(1) is disabled, (2) is otherwise qualified, and (3) requested a plausibly reasonable accommodation." *Id.* The burden then shifts to the employer "to either rebut one or more elements of . . .  prima facie case, or to establish an affirmative defense." *Id.* After this, the burden returns to the plaintiff "to present evidence establishing a genuine dispute as to the affirmative defenses or as to the challenged elements of her prima facie case." *Id.* The court finds that AT&T is entitled to summary judgment, because the plaintiff has failed to establish that she is disabled, that her requested

accommodation was based on a disability, or that she was denied a reasonable accommodation.

In seeking summary judgment on this claim, AT&T first points to Ratliff's bare allegation of "severe anxiety and depression" and argues that she has not come forward with any evidence to show that it substantially limited her in a major life activity. Ratliff's only response is this:

> Here, Plaintiff experienced severe anxiety and distress, because of Defendant's actions, which affected Plaintiff's ability to work. *Cf. Rakity v. Dillon Cos., Inc.*, 302 F.3d 1152, 1158 (10th Cir. 2002) (Working is considered a major life activity). This medical condition caused her to take intermittent leave from work on a regular basis. The Court can reasonably infer that Plaintiff has a recognized impairment that substantially limited her ability to work.

ECF# 58, pp. 30-31. In reply, AT&T emphasizes that "the record is devoid of evidence to support the assertion" that she "experienced severe anxiety and depression." ECF# 60, p. 21. AT&T certainly argues the plaintiff has not proved any condition that substantially limits a major life activity and that her requested accommodation is based on any such disability. As the nonmovant in the summary judgment proceedings, Ratliff now bears the burden here to go beyond mere allegations and set forth specific facts that would be admissible in evidence at trial from which a rational fact finder could find she has a condition that substantially limits her ability to work. The plaintiff's burden includes identifying such facts by reference to affidavits, deposition transcripts, or other admissible exhibits. "[T]he nonmoving party must, at a minimum, direct the court to facts which establish a genuine issue for trial. In the face of a properly supported motion for summary judgment, the nonmoving party may not rely upon unsupported allegations without '"any significant probative evidence tending to support the complaint."'" *White v. York Intern. Corp.*, 45 F.3d 357, 360

(10th Cir. 1995) (quoting *Anderson*, 477 U.S. at 249 (quoting in turn *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

      For an actual disability under the ADA, a person "must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities." *Carter v. Pathfinder Energy Services, Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011) (internal quotation marks and citation omitted). The first two elements "are questions of law for the court," but the third "is ordinarily a question of fact for the jury." *Id*. (citation omitted); *see Mayfield v Target Corporation*, No. 18-4036-HLT, 2019 WL 5576938, at*3 (D. Kan. Oct. 29, 2019), *appeal dismissed,* 2020 WL 2556366 (10th Cir. Apr. 27, 2020). Ratliff is correct that the Tenth Circuit recognizes working as major life activity. *Carter,* 662 F.3d at 1143.

      Essentially, the plaintiff is asking the court to infer an impairment from her allegation that she experienced anxiety and stress as a result of her work environment. The plaintiff cites no legal authority for this being enough for a disability under the ADA's favorable definition of disability as clarified by the ADA Amendments Act of 2008 ("ADAA"). The plaintiff is also asking the court to find a question of fact for the jury that her job-specific anxiety and stress substantially limits her working, because she missed work during this period. As already noted, the plaintiff does not come forward with a summary judgment record establishing missed work caused by anxiety and stress. Not only has the plaintiff failed to carry her burden at summary judgment, but the law does not support such a theory of disability. The ADAAA and the modified EEOC regulations did not reduce a plaintiff's

requirement for demonstrating for the major life activity of working that she "was substantially limited in performing a class of jobs or broad range of jobs in various classes as compared to most people with comparable training, skills and abilities." *Allen v. SouthCrest Hosp.*, 455 Fed. Appx. 827, 835 (10th Cir. Dec. 21, 2011) (plaintiff admitted her migraines were caused by stress from working for particular employer and no evidence of migraines from working for other employers or other jobs); *Vannattan v. VendTech-SGI, LLC*, No. 16-2147-JWL, 2017 WL 2021475, at *4 (D. Kan. May 12, 2017) ("As the interpretive Guidance to the amended regulations explains, the major life activity of working 'will be used in only very targeted situations' and in 'rare cases' when an individual has a need to demonstrate that an impairment substantially limits him or her in working." (quoting *Substantially Limited in Working*, Appendix to Part 1630—Interpretative Guidance on Title I of the Americans With Disabilities Act, 29 C.F.R. Pt. 1630, App.)).  The Tenth Circuit in *Allen* found the plaintiff did not make a prima facie case of being disabled in the major life activity of working from only showing she experienced migraines while working for a particular employer. 455 Fed. Appx. at 834-835. Similarly, the Tenth Circuit in *Siemon v. AT&T Corp.*, 117 F.3d 1173, 1176 (10th Cir. 1997), held that the plaintiff's severe depression and anxiety brought on by working under a particular supervisor had failed to show he was "substantially limited in performing a class of jobs or a broad range of jobs in various classes."

The plaintiff here does not argue or present evidence that her impairment exists apart from her experiences from being in her specific work setting. Other courts have held that, "it is well-established that the inability to work with

particular co-workers or supervisors does not create a substantial limitation on the major life activity of working." *Knight v. McCarthy*, 439 F. Supp. 3d 744, 759-60 (E.D. Va. 2020) (citing *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524-25 (7th Cir. 1996) ("The major life activity of working is not 'substantially limited' if a plaintiff merely cannot work under a certain supervisor because of anxiety and stress" and if plaintiff "can do the same job for another supervisor, she can do the job, and does not qualify under the ADA")); *Patterson v. McDonald*, 220 F. Supp. 3d 634, 638-39 (M.D.N.C. 2016) (citing in part *Weiler v. Household Fin. Corp.*, 101 F.3d at 524-25; Siemon v. AT & T Corp., 117 F.3d at 1176 (holding that a mental impairment preventing plaintiff from "working under a few supervisors within the organizational structure of one major corporation . . . is far too narrow to constitute a 'class of jobs' "); *Palmer v. Circuit Court of Cook Cty.*, 117 F.3d 351, 352 (7th Cir.) ("[A] personality conflict with a supervisor or coworker does not establish a disability within the meaning of the disability law, . . . even if it produces anxiety and depression, as such conflicts often do.")), *cert. denied*, 522 U.S. 1096 (1997); *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1062 (7th Cir. 2000)( "Standing alone, a personality conflict between an employee and a supervisor—even one that triggers the employee's depression—is not enough to establish that the employee is disabled, so long as the employee could still perform the job under a different supervisor."). In a more recent published decision, the Second Circuit confirmed its place along with other circuit courts in holding "that an impairment does not rise to the level of a 'disability' if it only impairs the employee's ability to perform his or her current job." *Woolf v. Strada*, 949 F.3d 89, 95 (2nd Cir. 2020) (and cases cited therein).  AT&T is entitled to summary judgment as the

plaintiff has not alleged and come forward with evidence to show she is disabled under the ADA. Consequently, the plaintiff cannot show that her request for accommodation here to work at home was based on a disability.

Even assuming the plaintiff had met her burdens of showing that she had a disability and that her request for accommodation was based on a disability, the plaintiff still could not avoid summary judgment as she was never denied a reasonable accommodation. The plaintiff did work from home for the balance of her employment at AT&T consistent with her requested accommodation. That AT&T had not yet granted her request to make home employment permanent does not show any denial of a reasonable accommodation. The uncontroverted facts show AT&T's home employment arrangement during COVID effectively afforded a reasonable alternate accommodation for as long as the plaintiff remained at AT&T. The summary judgment record shows AT&T's representatives communicated through calls and emails with Ratliff over her requested accommodation. The plaintiff does not come forward with arguments or facts showing these to be insufficient for a good faith interactive process. Nor has the plaintiff come forward with genuine issues of material fact that because of AT&T's manner of engaging in the interactive process that it then failed to identify an appropriate accommodation in violation of the ADA. *See Lowe v. Independent School Dist. No. 1 of Logan County*, 363 Fed. Appx. 548, 552-55 (10th Cir. Jan. 25, 2010). AT&T is entitled to summary judgment on Ratliff's ADA accommodation claim.

**FMLA CLAIMS**

16

In the pretrial order, Ratliff states two FMLA claims. The first is an unlawful interference claim:

> Defendant unlawfully interfered with Plaintiff's rights under the FMLA, 29 U.S.C. § 2601, et seq. Plaintiff was not able to JOG or STR due to being out on FMLA during the Surplus period. The inability to JOG or STR came from Plaintiff's usage of FMLA wherein her efficiency numbers were affected because of time off pursuant to her FMLA usage.

ECF# 50, pp. 10-11. The second is a retaliation claim:

> Defendant retaliated against Plaintiff as a consequence of exercising her rights under the FMLA, 29 U.S.C. § 2601, et seq. Plaintiff was not able to JOG or STR due to being out on FMLA during the Surplus period. The inability to JOG or STR came from Plaintiff's usage of FMLA wherein her efficiency numbers were affected because of time off pursuant to her FMLA usage. The lower efficiency numbers affected her ratings and prevented her from qualifying for JOG.

*Id.* at p. 11.

A prima facie case of FMLA interference requires a plaintiff to show that "(1) [s]he was entitled to FMLA leave, (2) [employer] . . . took some adverse action that interfered with [her] . . . right to take FMLA leave, and (3) this adverse action was related to the exercise or attempted exercise of [her] . . . FMLA rights." *Gardenhire v. Manville*, 722 Fed. Appx. 835, 841 (10th Cir. Feb. 7, 2018) (citing *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006)). "Employees who take FMLA leave are entitled, upon their return, to be restored to the job they held when the leave commenced or to be restored to an equivalent job with equivalent benefits, pay, and other employment terms and conditions." *Gardenhire*, 722 Fed. Appx. at 841 (citing  29 U.S.C. § 2614(a)(1)). Arguably then, it would be an actionable adverse action if an employer used an employee's FMLA leave to deny restoration of employment terms and conditions, as alleged here. As discussed below, the plaintiff has not made this showing.

17

Absent direct evidence, "'[r]etaliation claims under the FMLA are subject to the burden-shifting analysis of *McDonnell Douglas*.'" *Dewitt v. S.W. Bell Tel. Co.*, 845 F.3d 1299, 1318 (10th Cir. 2017) (quoting *Metzler*, 464 F.3d at 1170). This begins with the plaintiff proving a prima facie case of retaliation that, "'(1) she engaged in a protected activity; (2) [the defendant] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action.'" *Id.* (quoting *Metzler*, 464 F.3d at 1170–71 (footnote omitted)) If the plaintiff is successful, then the burden shifts to the defendant employer to "'offer a legitimate, non-retaliatory reason for the employment action. The plaintiff then bears the ultimate burden of demonstrating that the defendant's proffered reason is pretextual.'" *Id.* at 1319 (quoting *Metzler*, 464 F.3d at 1170 (citation omitted)). Taking FMLA leave is protected activity. *Id.* at 1319.

Common to both claims is the plaintiff's allegation that AT&T adversely acted in determining her eligibility for JOG or STR based on efficiency numbers affected by her FMLA leave. As set out in the above statement of uncontroverted facts, AT&T has established that Ratliff's FMLA leave did not impact her efficiency score. The plaintiff did not controvert the AT&T's statement that FMLA leave is an approved absence and did not affect at-risk employees' eligibility for JOG. Equally uncontroverted is the fact that efficiency scores are measured only while employees are at work, so any time off work, including FMLA time, could not impact the efficiency score. In her summary judgment brief, the plaintiff argues, "Even though Plaintiff was on approved FMLA leave, Defendant removed Plaintiff's August 2020

performance numbers" which lowered her efficiency rating and made her ineligible for JOG. ECF# 58, p. 36. The plaintiff does not present any evidence to prove that the removal of her August numbers was due to her FMLA leave and that it was the removal of her August numbers which made her ineligible for JOG. Instead, it is uncontroverted that the August numbers were removed from everyone's efficiency score "due to a SOE/BERT issue." It is also uncontroverted Ratliff's efficiency numbers were later run with and without the August numbers, and her efficiency score remained less than the required 100%. *Id*. at 3. The plaintiff has not come forward with evidence to show proof for the second and third elements for her interference claim and retaliation claim as she has alleged them. AT&T is entitled to summary judgment on the FMLA claims.

**TITLE VII AND § 1981 CLAIMS**

The plaintiff alleges AT&T committed Title VII discrimination and retaliation by issuing a nine-month written warning against her in response to her complaint of protected activity, and this "subsequently affected Plaintiff's ability to transfer during the Surplus in the Fall of 2020" and resulted in her "forced disposition from the company." ECF# 50, pp. 11-12. The plaintiff's § 1981 claim asserts that after her forced disposition, the defendant offered to rehire her but retracted the offer based on her race. The plaintiff fails to address the defendant's arguments for summary judgment on her race discrimination claims under Title VII and § 1981. A plaintiff's failure to address an asserted claim in her response to a motion for summary judgment is proper grounds to grant summary judgment in the defendant's favor. See *Klaassen v. Atkinson*, 348 F.Supp.3d 1106, 1188 (D. Kan. 2018) (citing

19

*Hinsdale v. City of Liberal, Kan.*, 19 Fed. Appx. 749, 768–69 (10th Cir. 2001) (affirmed the district court granting summary judgment against plaintiff for having abandoned his claim by not addressing it in his response opposing summary judgment.). The court agrees with AT&T that the plaintiff has abandoned her Title VII and § 1981 race discrimination claims entitling the defendant to summary judgment on them. What remains is the plaintiff's Title VII retaliation claim.

Absent direct evidence of discrimination, Title VII retaliation claims use a burden-shifting framework that requires a plaintiff first to show a prima facie case that she (1) engaged in protected opposition to discrimination, (2) sustained what a reasonable employee would find to be a materially adverse action, and (3) has evidence supporting a reasonable inference of a causal connection between the protected activity and the materially adverse action. *Parker v. Lafarge West, Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017). AT&T first contends that the plaintiff cannot prove any materially adverse action.

This court recently laid out the relevant Tenth Circuit law noting that a broad definition of adverse employment action obviously furthers the statutory purposes:

> We have stated that adverse employment actions "constitute[ ] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003) (internal quotation and citation omitted). We have also recognized that monetary losses take a variety of forms including shifts in compensation or benefits. *See Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998).
>
> *Orr v. City of Albuquerque*, 417 F.3d 1144, 1150 (10th Cir. 2005). "In so defining the phrase, we consider acts that carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future

20

employment prospects." *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239 (10th Cir. 2004) (internal quotation marks and citation omitted). The Tenth Circuit takes "a case-by-case approach" looking at the factors unique to the situation, but without considering what are "mere inconvenience[s] or an alteration of job responsibilities." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998) (internal quotation marks and citation omitted).

An adverse action "is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). On the other hand, an actionable adverse action is not everything that makes an employee unhappy. *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005), abrogated on other grounds by, *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018). "'[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Reinhardt v. Albuquerque Public Schools Bd. of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. at 68.). This standard looks to a reasonable person in the plaintiff's position considering all relevant circumstances, and so it is "an objective inquiry that does not turn on a plaintiff's personal feelings about the circumstances." *Semsroth v. City of Wichita*, 555 F.3d 1182, 2284 (10th Cir. 2009).

In *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1216 (10th Cir. 2010), the Tenth Circuit held that, "'Title VII protects individuals "not from all retaliation" but only from retaliation "that produces an injury or harm"'" that itself raises to a "'level of seriousness.'" *Id.* (quoting *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1086 (10th Cir. 2007) (quoting in turn *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. at 67)). Thus, requiring a level of adversity that a reasonable employee would regard materially adverse "is necessary to separate significant from trivial harms, petty slights, minor annoyances, and simple lack of good manners, ... [and] [o]therwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like." *Id.* (internal quotation marks and citations omitted).

. . . A reprimand is an adverse employment action "if it affects the likelihood that the plaintiff will be terminated, undermines the plaintiff's current position, or affects the plaintiff's future employment opportunities." *Medina v. Income Support Div., New Mexico*, 413 F.3d 1131, 1137 (10th Cir. 2005). The 2018 disciplinary incident report did not result in any change to Ross's job title, rate of pay, or benefits, or in the loss of any salary. Ms. Villanueva, a HR representative with Pentair, testified that disciplinary incident reports are retained for 12 months to be considered for any next steps of discipline, and after 12 months the reports may remain in an employee's file but are not to be used as part of the progression of discipline. Ross fails to allege how this single incident report could have any bearing on his likelihood of being fired or could harm his future employment prospects. *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1270 (10th Cir. 2005). This single

> report did not put him into at-risk status. *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1224 (10th Cir. 2006), *abrogation on other grounds recognized by, Bertsch v. Overstock.com*, 684 F.3d 1023, 1029 (10th Cir. 2012); *see Olson v. Shawnee County Bd. of Com'rs*, 7 F.Supp.3d 1162, 1206 (D. Kan. 2014); *Boese v. Fort Hays State University*, 814 F.Supp.2d 1138, 1148 (D. Kan. 2011), *aff'd*, 462 Fed. Appx. 797 (10th Cir. 2012). The presence of the second reprimand in January 2019 would create a closer question, but Pentair eventually rescinded and removed it from Ross's file before he sustained any tangible employment harm. "[A]n employer's decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action." *Orr v. City of Albuquerque*, 417 F.3d 1144, 1151 n.7 (10th Cir. 2005). Under this precedent, a reasonable employee in the plaintiff's circumstances would not regard this single incident report for performance and the subsequently withdrawn incident report for behavior as materially adverse actions that would dissuade him/her from complaining about discrimination.

*Ross v. Pentair Flow Techs., Inc.*, 19-2690-SAC, 2021 WL 4134317, at *7-8 (D. Kan. Sept. 10, 2021). The summary judgment record fully establishes that the plaintiff did not lose any pay or benefits from the single written warning which expired without any further steps of discipline. The plaintiff grieved this discipline, and it was settled by a reduction to a six-month performance notice. A month before this settlement was reached, Ratliff received an email confirming that her nine-month written warning had expired and the step of discipline was inactive. Under Tenth Circuit case law, these circumstances do not rise to the level of adversity that a reasonable employee would regard them as materially adverse.

As laid out in the pretrial order, the plaintiff claims the discipline affected her ability to transfer during the Surplus in the Fall of 2020 resulting in her forced disposition from the company. The written summary judgment record simply does not support this claimed adverse action. The plaintiff did not effectively controvert the defendant's statement that as to STRs, AT&T "did not consider whether employees were on a step of discipline or were not her meeting performance

expectations." ECF# 52-1 at ¶ 13. The court agrees with AT&T that the pretrial order fails to state the plaintiff's claim of retaliation based on the denial of JOG. But even if the plaintiff had included this claim, she has similarly failed to controvert the defendant's statement that AT&T's determination of meeting expectations for JOG "was based on current status and was not based on prior performance appraisals or any expired discipline." *Id.* at ¶ 23. It is also uncontroverted that Ratliff did not meet expectations because of her efficiency scores and that her written warning expired before any transfer or JOG decisions made in the surplus. In sum, the plaintiff does not come forward with any evidence to create a genuine dispute of material fact that her written warning and its impact on any performance review would have affected any STR or JOG determination made in this case. The plaintiff's unsupported allegations are not enough to avoid summary judgment. The plaintiff does not come forward with any evidence of another employee receiving a transfer that she should have received. Without proof that she suffered the adverse action alleged in her claim or any adverse action connected to her statement in December of 2019, the plaintiff's Title VII claim is subject to summary judgment.

IT IS THEREFORE ORDERED that the AT&T's motion for summary judgment (ECF# 51) is granted, and AT&T's motion to exclude evidence from the plaintiff's social worker (ECF# 53) is denied as moot.

Dated this 25th day of February, 2022, Topeka, Kansas.


s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge